# UNITED STATES DISTRICT COURT
for the
District of Northern Indiana

=FILED=

FEB 2 3 2016

At
ROBERT N. TRGOVICH, Clerk M
U.S. DISTRICT COURT
NORTHERN DISTRICT OF INDIANA

| | |
|---|---|
| DAVID EDWARDS<br>*Plaintiff*<br>v.<br>BIOMET, INC., BIOMET ORTHOPEDICS, LLC,<br>and BIOMET U.S. RECONSTRUCTION, LLC,<br>*Defendants* | )<br>)<br>)<br>)<br>)<br>)<br>) |

Civil Action No. 3:16 CV 105 RM

## CIVIL COMPLAINT

Plaintiff, David Edwards, residing at 18173 Highway 491, Cortez, CO, Montezuma County, in the state

of Colorado, by and through Plaintiff's attorneys, KILLIAN DAVIS Richter & Mayle, P.C., upon information

and belief, and at all times hereinafter mentioned alleges as follows:

## INTRODUCTION AND SUMMARY OF ACTIONS

1. For numerous years, Defendants have known that their hip replacement device the M2A- taperloc 32mm

   Hip Replacement System (hereinafter, the "Device") – is prone to fail years before its expected life.

   They have also known that the implant's metal "ball" and "socket" bearings that make up the hip-joint

   generate metal debris over time from wear and tear that can spread throughout the patient's surrounding

   bone and tissue.. As a result of these defects, patients with the Devices implanted have endured, or will

   endure, unnecessary pain and suffering; debilitating lack of mobility; inflammation, causing damage or

   death to surrounding tissue and bone; and a subsequent more difficult revision surgery to replace the

   faulty devices, giving rise to still more debilitation, a prolonged recovery time, and an increased risk of

   complications and death from surgery. As a result of these defects, patients have also experienced

   damage to nerve cells as well as bone and tissue in other parts of the body, particularly the lower

   extremities, resulting from the migration and accumulation of metal wear particles and metal ions. But

   rather than recalling the Device upon receiving notice of complaints made to the United States Food and

Drug Administration ("FDA") regarding the defects discussed above, or warning physicians and patients of those risks and precautions such as metal level monitoring, Defendant continued to aggressively market the Device, claiming it was a safe and effective hip replacement system.  Indeed, Defendants sought to capitalize on the problems with metal on metal prosthetic hips manufactured by competitors by asserting the superiority of the Device.

2. Plaintiff's suffering could easily have been prevented.  Plaintiff would not have suffered from unnecessary pain and debilitation, as well as the need to undergo subsequent revision surgery, had Defendants taken the affirmative step of recalling the Device, when dozens of complaints began begin made to the FDA regarding the Device's failures, or had Defendants at least warned the orthopedic surgical community and the public of the dangers of the Device so that those who had the Device implanted could be medically monitored for signs of the Device malfunctioning including loosening and metal debris related injuries.  Plaintiff seeks redress for his injuries.

3. Plaintiff brings this action under the laws of the state of Colorado.

## PARTIES

4. Plaintiff is over the age of majority and is a citizen and resident of the state of Colorado.  Plaintiff has been injured due to the defective medical prosthesis manufactured by Defendants.

5. Defendant, BIOMENT, INC. is, and at all times relevant to this complaint was, an Indiana Corporation with its principal place of business in Warsaw, Indiana.  Defendant, BIOMET, INC., is and was at all times relevant herein doing business in and/or directing its activities in the State of Colorado.

6. Defendant, BIOMET, INC., designed, manufactured, marketed, promoted, and sold the M2A-32 Hip system that is the subject of this lawsuit.

7. Defendant BIOMET ORTHOPEDICS, LLC, is, and at all times relevant to this complaint was, a wholly owned subsidiary of Defendant, BIOMET, INC., an Indiana Corporation with its principal place of business in Warsaw, Indiana.  The sole member of Defendant BIOMET ORTHOPEDICS, LLC, is

2

Defendant BIOMET INC., which is a resident of Indiana. Accordingly, the citizenship of defendant BIOMET ORTHOPEDICS, LLC, is Indiana. Defendant, BIOMET ORTHOPEDICS, LLC, is and was at all times relevant herein doing business in and/or directing its activities in the State of Colorado.

8. Defendant, BIOMET ORTHOPEDICS, LLC, designed, manufactured, marketed, promoted and sold the M2A-32 Hip system that is the subject of this lawsuit.

9. Defendant, BIOMET ORTHOPEDICS, LLC, is, and at all times relevant to this complaint was, a wholly owned subsidiary of Defendant BIOMET U.S. RECONSTRUCTION, LLC, an Indiana Corporation with its principal place of business in Warsaw, Indiana.

10. Defendant, BIOMET U.S. RECONSTRUCTION, LLC, is, and at all times relevant to this complaint was, a wholly owned subsidiary of defendant BIOMET, INC., an Indiana Corporation with its principal place of business in Warsaw, Indiana. The sole member of Defendant BIOMET U.S. RECONSTRUCTION, LLC is Defendant BIOMET, INC., which is resident of Indiana. Accordingly, the citizenship of defendant BIOMET U.S. RECONSTRUCTION, LLC, is Indiana. Defendant, BIOMET U.S. RECONSTRUCTION, LLC, is and was at all times relevant herein doing business in and/or directing its activities in the State of Colorado.

11. Defendants, BIOMET, INC.; BIOMET ORTHOPEDICS, LCC; and BIOMET U.S. RECONSTRUCTION, LLC, are collectively referred to herein as "Biomet" or Defendants.

12. At all times relevant herein, Defendants were the agents of each other, and in doing the things alleged herein, each Defendant was acting within the course and scope of its agency and was subject to and under the supervision of its co-Defendants.

13. Upon information and belief, at all times herein mentioned, the employees of all Defendants, their subsidiaries, affiliates, and other related entities, as well as the employees of the Defendants' subsidiaries, affiliates, and other related entities, were the agents, servants and employees of Defendants, and at all relevant times, were acting within the purpose and scope of said agency and employment. Whenever reference in this complaint is made to any act or transaction of Defendants, such allegations

3

shall be deemed to mean that the principals, officers, employees, agents, and/or representatives of the

Defendants committed, knew of, performed, authorized, ratified and/or directed such act or transaction

on behalf of Defendants while actively engaged in the scope of their duties.

## JURISDICTION AND VENUE

14. Venue of this case is appropriate in The United States District Court for the District of Colorado.

    Plaintiff states that but for the court's February 15, 2013, Case Management Order permitting direct

    filing into the Northern District of Indiana, plaintiff would have filed this action in the United States

    District Court for the District of Colorado. Plaintiff respectfully requests that at the time of transfer of

    this action back to the trial court for further proceedings that the action be transferred to the United

    States District Court for the District of Colorado.

15. This court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) as the parties are citizens of

    different States, and the amount in controversy exceeds the sum of value of $75,000, exclusive of

    interest and costs.

16. Venue is proper in this district pursuant to 28 U.S.C. § 1391, because a substantial part of the events

    giving rise to this claim occurred in Colorado.

## FACTUAL ALLEGATIONS

### I.  THE BIOMET DEFENDANTS MANUFACTURED AND MAREKTED THE M2A-32 HIP REPLACEMENT SYSTEM, THE DEVICE, TO THE PUBLIC, EVEN THOUGH THEY KNEW, OR SHOULD HAVE KNOWN, OF THE DANGER THAT THE DEVICE POSED TO THE PUBLIC.

17. The Device was developed in order to reconstruct human hip joints that are diseased due to a variety of

    debilitating conditions.  The hip joint connects the thigh (femur) bone of a patient's leg to the patient's

    pelvis.  The hip joint is like a ball that fits in a socket.  The socket portion of the hip is called the

    acetabulum.

18. A total hip replacement implant device typically consists of four separate components: a femoral stem, a femoral head (or ball), a liner, and an acetabular shell (socket). Usually these components are made of metal and plastic.

19. The M2A-32 Hip Replacement System (the Device) has only three components: a metal femoral head, a metal taper insert, and a metal acetabulum cup. The metal femoral head can be attached to a femoral stem to complete a total hip replacement. As a result of the use of metal in the ball, taper insert, and socket components, the Device is referred to by the industry as a Metal-on-Metal (MoM) Implant Device.

20. These devices were marketed with the claim that they would last much longer than the conventional hip implant with a polyethylene liner. Indeed, Defendants marketed the Device as having many advantages over other hip replacements or hip resurfacing systems. Defendants advertised that "range of motion studies performed on the M2A-32 suggests an average of 154 degrees of motion – this is more than any other metal-on-metal system on the market", and that "the plasma spray porous coating is more than twice as resistant to cup displacement under rim load than other coatings."

21. When initially released, Defendants promoted the Device as a metal-on-metal articulation achieving "maximum range of motion, stability, and minimal wear." They advertised that "the large 38mm bearing surface exhibits similar wear characteristics to that of the 28 mm and the 32 mm metal-on-metal articulations, approximately 1/350[th] the wear of metal-on-polyethylene."

22. Even as other MoM devices came under scrutiny for their high rates of failure over the years, Defendants continued to falsely advertise the Device as a superior and safe replacement, citing biased and misleading studies and data including stating that the hip replacement was subject to reduced wear and revision.

23. Contrary to what Defendants' marketing campaigns suggest, for many years Defendants have known of the risks inherent in MoM devices, including the M2A-32 Hip Replacement System. Specifically, for several years, the FDA had been receiving complaints that the Device prematurely failed in some

patients, due to component loosening, dislocation, component wear, and fracture, as a result of the design of the Device. In addition, Defendants received reports that the implant's "ball" and "socket" – which are both metal bearings – generate metal debris over time from normal wear, and that this debris can spread throughout the surrounding bone and tissue causing severe inflammation and damage, and can migrate to other parts of the body, particularly lower extremities, causing more widespread bone and tissue damage.

24. Defendants were aware that the British Medicines and Healthcare Products Regulatory Agency (MHRA) and the FDA had expressed concern about Metal-on-Metal hip replacements and the impact of metal ions. Defendants, as part of industry trade groups, participated in discussion of studies of the health effects with other manufacturers of MoM prosthetic devices during that time period.

25. Defendants' reason to conceal the defect in its M2A-32 Hip Replacement System is clear: hip implant sales are critically important to Defendants. During the time period relevant to this complaint, Defendants' management was trying to make Defendants look appealing to investors, and in 2007, they were ultimately purchased by a private equity firm for $10 billion.

26. Rather than admit that these popular products had a critical defect that could cause a premature failure, forcing patients to have to undergo a painful hip revision surgery, as well as address more widespread debilitating medical problems resulting from migrating metal wear particles, Defendants chose to pursue corporate profits at the expense of patient safety. Defendants continued to promote, market, and sell the Device despite the fact that they knew or should have known that the product was defective. To this day, Defendants continue to sell these defective implants to unsuspecting patients without adequately warning about the risks of the failures that have been reported.

27. In 2011, the Australian Orthopedic Association published its annual report on data collected from the Australian National Joint Registry, which tracks surgical revisions of orthopedic devices in Australia (the United States do not have such a registry). The report showed that the Device had a yearly

cumulative revision rate of 7.2% after seven years, with a statistical range of 5.3% and 9.7%, a significantly higher revision rate than some other MoM hip replacements.

28. In May of 2011, the FDA required Defendants, and other manufacturers, to provide data on levels of metal in the blood of patients implanted with their MoM hip implants due to rising concerns regarding their use. The request followed the release of British studies from March 2010 showing that MoM implants, such as the Device, are potentially dangerous because they can generate large amounts of metallic debris as they wear over time. Metallic debris has been shown to cause severe inflammatory responses in some patients, resulting in pain in the groin, death of tissue in the hip joint, and loss of surrounding bone. These injuries often require revision surgery to replace the Device before its expected expiration date. Metal wear particles also migrate to other parts of the body, particularly the lower extremities, where they accumulate, release ions, and can cause irreversible damage to nerve cells, tissue, and bone.

29. In a systematic review of clinical trials, observational studies, and registries conducted by the FDA and published in the British Medical Journal on November 29, 2011, it was found that MoM hip implants are no more effective than traditional polyethylene-lined implants, and increase the risk of revision surgery. Therefore, MoM hip implants increase the safety risk to patients without providing any benefit over traditional hip implants. Due to this poor risk-benefit profile, sales of the Device have decreased substantially.

30. As a result of the issues with the Device, recipients of the Device have suffered symptoms including pain, swelling, inflammation, and damage to surrounding bone and tissue, as well as a lack of mobility. These symptoms are the result of possible loosening of the implant, where the implant does not stay attached to the bone in the correct position; fracture, where the bone around the implant may have broken; dislocation, where two parts of the implant that move against each other are no longer aligned; or the spread of metal debris generated from the metal femur head and metal acetabular cup rubbing and rotating against each other. For these reasons, revision surgeries have been necessary to remove the

7

faulty Devices. However, these revision surgeries present enormous risks to the patients because they are technically more difficult than the original surgery to implant the Device, the patient is more at risk of complications and death, and the recovery time is more prolonged as compared to the original hip replacement surgery.

## II. AS A DIRECT AND PROXIMATE RESULT OF BIOMET'S FAILURE TO RECALL THE DEVICE, PLAINTIFF WAS IMPLANTED WITH A DEVICE, AND NOW HAS DEBILITATING PAIN AND INJURIES CAUSED BY METAL PARTICULATE AND WAS REQUIRED TO UNDERGO REVISION SURGERY TO REPLACE THE DEVICE AS WELL AS SURGICAL RECONSTRUCTION TO STABILIZE WIDESPREAD, DEGENERATIVE DAMAGE TO BOTH OF HIS FEET.

31. During all material times, Plaintiff has been a resident of the State of Colorado.

32. On or about August 31, 2002, Plaintiff underwent a total right hip replacement surgery by Dr. Stephen Faust at Ann Arundel Medical Center in Annapolis, Maryland and received a M2A-32 Hip Replacement System Device.

33. After the surgical implantation of the Device, Plaintiff suffered symptoms including but not limited to increasing debilitating pain, discomfort, soreness, dysfunction, loss of range of motion, and pain in his feet, later determined to be cobalt poisoning.

34. Plaintiff was not warned that he was at risk of progressive worsening of his condition due to the debilitating effects of metal wear particles; rather, in 2006, understanding that he was going to be in pain, he was placed on a regimen of chronic pain management.

35. In 2011, Plaintiff began experiencing severe and persistent pain in both of his feet, which was determined to be from widespread fractures and Charcot-like deformation due to nerve damage and consequent dissolution of connective tissue as a result of the effects of accumulated metal particulate from the Device.

36. In 2012, as a result of blood tests ordered by his orthopedic surgeon in Cortez, Colorado, who was treating him for left knee issues, Plaintiff learned that he had abnormally high blood levels of Cobalt and Chromium, as a result of metal wear particles from the Device.

37. On December 11, 2014, Plaintiff was required to undergo a revision surgery, which was performed by Dr. Amber Randall at Flagstaff Medical Center in Flagstaff, Arizona to replace the failed Device and to prevent further damage to his feet and other parts of his body from migrating and accumulating metal wear particles.

38. On September 2, 2015, Plaintiff was required to undergo complex reconstructive surgery on his left foot to stabilize widespread fractures and degeneration resulting from exposure to accumulated metal particulate from the Device.

39. In the upcoming months, Plaintiff will be required to undergo an even more complex and extensive reconstructive surgery on his right foot to stabilize widespread fractures and degeneration resulting from exposure to accumulated metal particulate from the Device.

40. An employee and/or agent of Defendants provided the Device to Dr. Stephen Faust, who implanted the Device on August 31, 2002, the date of the original right hip replacement surgery.

41. Beyond merely providing the Device to the surgeon, agents of Defendants were hired by Defendants to aggressively promote, distribute, and sell the Device.

42. Directors, managers, and sales representatives of Defendants received training and education from Defendants, including orthopedic and surgical training, product design rationale for the Device, education regarding proper use of the tools to implant the Device, selection of complementary components to the Device, and training on how to sell the Device to surgeons over hip replacements offered by competitors.

43. On numerous occasions, Defendants met with orthopedic surgeons, including, based on information and belief, with Plaintiff's orthopedic surgeon, to promote the M2A-32 Hip Replacement System. At some or all of these meetings, a representative or representatives of Defendants was present. During these meetings, Defendants assured the orthopedic surgeons, including Plaintiff's orthopedic surgeon, that the M2A-32 Hip Replacement System was safe, effective, was the best product on the market, had an

excellent track record, had very low wear, would last longer than traditional hip implants, and had a low and acceptable failure rate.

44. Defendants continued to defend the Device even after they became aware of numerous and serious complications with it. Biomet did not reveal, but rather concealed, their knowledge of numerous and serious complications and other "bad data" during their meetings with orthopedic surgeons, including Plaintiff's orthopedic surgeon.

45. Plaintiff's revision surgery has subjected him to much greater risks for future complications than he had before the revision surgery. For example, several studies have found that a revision surgery causes a much higher risk of dislocation compared with an original hip replacement surgery. In one study conducted by Charlotte Phillips and her colleagues at Brigham and Women's Hospital in Boston, 14.4 percent of patients who underwent a revision surgery suffered from a dislocation compared to 3.9 percent of patients who underwent an original hip replacement surgery. In other words, hip replacement patients who have undergone revision surgery are almost four times more likely to suffer from a hip dislocation than those who have not. (Phillips CB, *et al.* Incidence rates of dislocation, pulmonary embolism and deep infection during the first six months after elective total hip replacement. *American Journal of Bone and Joint Surgery* 2003; 85:20-26.)

46. Defendants were instrumental in educating Plaintiff's orthopedic surgeon regarding claimed advantages of the product, addressing the questions of the surgeon.

47. Had Plaintiff known that the Device caused injury and had the potential to require revision surgery to remove the Device and require additional reconstructive surgeries to repair other metal related damage to bone and tissue, including both of his fee, with no additional benefit when compared to traditional hip implants, Plaintiff would not have chosen the Device for the hip implant surgery. Rather, Plaintiff surgeon would have opted for the safer and more effective traditional hip implant utilizing a polyethylene liner.

48. As a direct and proximate result of the implantation of the Device, Plaintiff has suffered significant harm, including but not limited to, physical injury and bodily impairment, debilitating lack of mobility, conscious pain and suffering, elevated metal ion levels, and loss of earnings. As a result, Plaintiff has sustained and will continue to sustain damages in an amount to be proven at trial.

### FIRST CAUSE OF ATION
### STRICT PRODUCTS LIABILITY (DESIGN DEFECT)
### AGAINST ALL DEFENDANTS

49. Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further alleges as follows:

50. At all times herein mentioned, Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and/or distributed the Device as hereinabove described that was surgically implanted in Plaintiff.

51. At all times herein mentioned, the Device was in an unsafe, defective, and inherently dangerous condition for users such as Plaintiff that had the Device surgically implanted.

52. The Device was in an unsafe, defective, and inherently dangerous condition at the time it left Defendants' possession.

53. At all times herein mentioned, the Device was expected to and did reach the usual consumers, handlers, and persons coming into contact with said product without substantial change in the condition in which it was designed, produced, manufactured, sold, distributed and marketed by Defendants.

54. The Device's unsafe, defective, and inherently dangerous condition was a cause the Plaintiff's injuries.

55. The Device failed to perform as safely as an ordinary consumer would expect when used as intended or in a reasonably foreseeable manner.

56. Plaintiff's injuries resulted from use of the Device that was both intended and reasonably foreseeable by Defendants.

11

57. At all times herein mentioned the Device posed a risk of danger inherent in the design which outweighed the benefits of that design.

58. At all times herein mentioned, the Device was defective and unsafe, and Defendants knew or had reason to know that said product was defective and unsafe, especially when used in the form and manner as provided by Defendants.

59. At all times herein mentioned, the Defendants knew, or should have known, that the Device was in a defective condition, and was and is inherently dangerous and unsafe in that condition.

60. At the time of the implantation of the Device into Plaintiff, the aforesaid product was being used for the purposes and in a manner normally intended, namely for use as a hip replacement device.

61. Defendants, with this knowledge, voluntarily designed their Device in a dangerous condition for use by the public and, in particular, Plaintiff.

62. Defendants had a duty to create a product that was not unreasonably dangerous for its normal, intended use.

63. Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed a defective product which, when used in its intended or reasonably foreseeable manner, created an unreasonable risk to the health of consumers and to Plaintiff in particular, and Defendants are therefore strictly liable for the injuries sustained by Plaintiff.

64. As a direct and proximate result of defendant's placement of the defective Device into the stream of commerce, Plaintiff experienced and/or will experience severe harmful effects including but not limited to, partial or complete loss of mobility, loss of range of motion, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, the need for revision surgery to replace the Device, as well as reconstructive surgeries on both feet,  with the attendant risk of complications and death from such further surgeries.

65. Further, as a result of the foregoing acts and omissions, Plaintiff has suffered and/or will in the future suffer lost wages and a diminished capacity to earn wages.

**SECOND CAUSE OF ACTION**
**STRICT PRODUCTS LIABILITY (INADEQUATE WARNING)**
**AGAINST ALL DEFENDANTS**

66. Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further alleges as follows:

67. Defendants designed, manufactured, tested, marketed, and distributed into the stream of commerce the Device.

68. The Device placed into the stream of commerce by Defendants was defective due to inadequate warnings, because Defendants knew or should have known that the Device could fail early in patients and therefore give rise to physical injury, pain and suffering, debilitation, the need for a revision surgery to replace the Device, as well as reconstructive surgeries on both feet, with the attendant risks of complications and death from such further surgeries. Knowing this, Defendants failed to give consumers adequate warnings of such risks.

69. The Device is unreasonably dangerous because it was sold to Plaintiff without adequate warnings regarding, inter alia, the propensity of the Device to loosen and cause serious pain and necessitate additional surgery as well its propensity to generate metal debris resulting in metallosis and increased cobalt and chromium levels, and damage tissues and bone in patients.

70. The Device placed into the stream of commerce by Defendants was surgically implanted in a manner reasonably anticipated by Defendants.

71. As a direct and proximate result of Defendants' placement of the defective Device into the stream of commerce, Plaintiff experienced and/or will experience severe harmful effects including but not limited to, partial or complete loss of mobility, loss of range of motion, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, the need for a revision surgery to replace the Device, as well as

reconstructive surgeries on both feet, with the attendant risk of complications and death from such further surgeries.

72. Further, as a result of the foregoing acts and omissions, Plaintiff has suffered and/or will in the future suffer lost wages and diminished capacity to earn wages.

**THIRD CAUSE OF ACTION**
**BREACH OF EXPRESS WARRANTY AGAINST ALL DEFENDANTS**

73. Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further alleges as follows:

74. Defendants designed, manufactured, tested, marketed and distributed the Device into the stream of commerce.

75. Defendants expressly warranted that the Device was a safe and effective hip replacement system and that it would last longer than traditional polyethylene lined implant and was thus appropriate for young and active patients.

76. Indeed, as set forth in detail above, Defendants made numerous representations about the quality, safety, effectiveness, and expected lifetime of the Device. These representations by Defendants form express warranties.

77. The Device placed into the stream of commerce by Defendants did not conform to these express representations because they failed early thereby giving rise to unnecessary physical injury, pain and suffering, debilitation, and the need for a revision surgery to replace the faulty Device.

78. As a direct and proximate result of defendant's breach of express warranties regarding the safety and effectiveness of the Device, Plaintiff experienced and/or will experience significant damages, including but not limited to physical injury, economic loss, pain and suffering, the need for further surgery to replace the faulty Device, as well as reconstructive surgeries on both feet, and will continue to suffer such damages in the future.

79. As a result of the foregoing acts and omissions, Plaintiff has suffered and/or will in the future suffer lost wages and diminished capacity to earn wages.

## FOURTH CAUSE OF ACTION
## VIOLATION OF THE CONSUMER PROTECTION ACT
## AGAINST ALL DEFENDANTS

80. Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further alleges as follows:

81. Defendants unfairly, unconscionably, and deceptively advertised, marketed, sold, and represented the Device as a high-quality, safe and effective hip replacement system to Plaintiff and Plaintiff's physicians.

82. Before they advertised, marketed, sold, and represented the qualities of the Device that was implanted in Plaintiff, Defendants knew or should have known of the unreasonable dangers and serious health risks that MoM total hip replacement systems posed to patients like Plaintiff.

83. Plaintiff purchased and used the Device for personal use and thereby suffered ascertainable losses as a result of Defendants' action in violation of the consumer protection laws.

84. Had Defendants not engaged in the deceptive conduct described herein, Plaintiff would not have purchased and/or paid for the Device, and would not have incurred related medical costs and injury.

85. Defendants engaged in wrongful conduct while at the same time obtaining, under false pretenses, payment from Plaintiff for the Device that would not have been paid had Defendants not engaged in unfair and deceptive conduct.

86. Defendants engaged in unfair methods of competition or deceptive acts or practices that were prescribed by law, including the following:

   a. Representing that goods or services have characteristics, ingredients, uses, benefits or quantities that they do not have;

   b. Advertising goods or services with the intent not to sell them as advertised; and

15

      c.  Engaging in fraudulent or deceptive conduct that creates a likelihood of confusion of misunderstanding.

87. Plaintiff was injured by the cumulative and indivisible nature of Defendants' conduct. The cumulative effect of Defendants' conduct directed at patients, physicians, and consumers was to create a demand for, and sell the Device. Each aspect of Defendants' conduct combined to artificially create sales of the Device.

88. Defendants had, and continue to have, a statutory duty to refrain from unfair and deceptive acts or trade practices in the design, development, manufacture, promotion and sale of the Device.

89. Had Defendants not engaged in the deceptive conduct described above, Plaintiff would not have purchased the Device, and would not have incurred related medical costs.

90. Defendants' deceptive, unconscionable, fraudulent representations, and material omissions to patients, physicians, and consumers, including Plaintiff, constitute unfair and deceptive acts and trade practices in violation of the state consumer protection statutes.

91. Defendants' action, as complained of herein, constitutes unfair, unconscionable, deceptive, or fraudulent acts, or trade practices in violation of state consumer protection statutes.

92. Defendants have engaged in unfair competition or unfair and deceptive acts or trade practices or have made false representations in violation of the Colorado Consumer Protection Act, Colo. Rev. Stat. section 6-1-105, *et seq*, as well as the Maryland Consumer Protection Act, MD. Code, Comm. Law, T. 13, Subt. 3, *et seq.*

93. Under the statute enacted to protect consumers against unfair, deceptive, fraudulent, and unconscionable trade and business practices, and false advertising, Defendants are the suppliers, manufacturers, advertisers, and sellers, who are subject to liability under such legislation for unfair, deceptive, fraudulent, and unconscionable consumer sale practices.

94. Defendants violated the statutes that were enacted in Colorado and Maryland to protect consumers, like Plaintiff, from unfair, deceptive, fraudulent and unconscionable trade and business practices and false

16

advertising, by knowingly and falsely representing that the Device was fit to be used for the purpose for which it was intended, when in fact the Device was defective and dangerous, and by other acts alleged herein. These misrepresentations and omissions were made in Defendants' uniform promotional material.

95. The actions and omissions of Defendants alleged herein are uncured or incurable deceptive acts under the enacted statutes meant to protect consumers against unfair, deceptive, fraudulent, and unconscionable trade and business practices, as well as false advertising.

96. Defendants had actual knowledge of the defective and dangerous condition of the Device, failed to take any action to cure such defective and dangerous conditions, and continued to affirmatively market the Device to consumers.

97. Plaintiff and the medical community relied upon Defendants' misrepresentations and omissions in determining which hip implant device to use and recommend.

98. Defendants' deceptive, unconscionable or fraudulent representations and material omissions to patients, physicians and consumers, constituted unfair and deceptive acts and practices.

99. By reason of the unlawful acts engaged in by Defendants, and as a direct and proximate result therefor, Plaintiff has suffered ascertainable losses and damages.

100. As a direct and proximate result of Defendants' violations of the states' consumer protection laws, Plaintiff has suffered substantial economic losses and other damages and is entitled to statutory and compensatory damages in an amount to be proven at trial.

101. As described in detail above, Defendants knew that the Device subjected patients to early failure, painful and harmful physician reactions to toxic metallic particles and ions, death of tissue, bone loss, the need for explants and revision surgery to replace the Device, as well as reconstructive surgeries on both feet, with the attendant risks associated with such further surgeries.

102. As a direct and proximate result of Defendants' representations, Plaintiff has experienced and/or will experience significant damages, including but not limited to permanent physical injury, economic loss,

pain and suffering and the need for revision surgery to repair the physical damage to Plaintiff caused by the Device.

103. As a result of the foregoing acts and omissions, Plaintiff has suffered and/or will in the future suffer lost wages and diminished capacity to earn wages.

### FIFTH CAUSE OF ACTION
### NEGLIGENCE AGAINST ALL DEFENDANTS

104. Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further alleges as follows:

105. Defendants had a duty to exercise reasonable care in designing, researching, manufacturing, marketing, supplying, promoting, selling, testing, quality assurance, quality control, and/or distributing the Device into the stream of commerce, including a duty to assure that the Device would not cause those who had it surgically implanted to suffer adverse harmful effects from it.

106. Defendants failed to exercise reasonable care in designing, researching, manufacturing, marketing, supplying, promoting, selling, testing, quality assurance, quality control and/or distributing the Device into interstate commerce, in that Defendants knew or should have known that those individuals that had the Device surgically implanted were at risk for suffering harmful effects from it, including but not limited to, partial or complete loss of mobility, loss of range of motion, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as the need for a revision surgery to replace the Device with the attendant risks of complications and death from such further surgery.

107. The negligent acts of Defendants, their agents, servants, and/or employees, included but is not limited to the following acts and/or omissions:

   a. Designing the Device in a manner which was dangerous to those individuals who had the Device surgically implanted;

b. Designing, manufacturing, producing, creating, and/or promoting the Device without adequately, sufficiently, or thoroughly testing it;

c. Failing to conduct sufficient testing to determine whether or not the Device was safe for its intended use;

d. Defendants knew or should have known that the Device was unsafe and unfit for use by reason of the dangers to its users;

e. Selling the Device without making proper and sufficient tests to determine the dangers to its users;

f. Failing to adequately and properly warn Plaintiff or Plaintiff's physicians, hospitals, and/or health care providers of the dangers of the Device;

g. Failing to recall their dangerous and defective Device at the earliest date that it became known or should have been known that the Device was dangerous and defective;

h. Failing to provide adequate instructions regarding safety precautions to be observed by surgeons who would reasonably and foreseeably come into contact with, and more particularly, implant the Device into their patients;

i. Advertising and recommending the use of the Device despite the fact that Defendants knew or should have known of its dangerous propensities;

j. Representing that the Device was safe for use for its intended purpose, when, in fact, it was unsafe;

k. Manufacturing the Device in a manner which was dangerous to those individuals who had it implanted;

l. Producing the Device in a manner which was dangerous to those individuals who had it implanted, including Plaintiff;

m. Assembling the Device in a manner which was dangerous to those individuals who had it implanted;

    n. Defendants under-reported, underestimated, and downplayed the dangerous qualities of the Device;

108. Defendants were negligent in designing, researching, supplying, manufacturing, promoting, packaging, distributing, testing, advertising, warning, marketing, and selling the Device in that they:

    a. Failed to use due care in designing and manufacturing the Device so as to avoid the aforementioned risks to individuals that had the Devices surgically implanted;

    b. Failed to accompany their product with proper warnings;

    c. Failed to accompany their product with proper instructions for use;

    d. Failed to conduct adequate testing, including pre-clinical and clinical testing, and post-marketing surveillance to determine the safety of the Device;

    e. Willfully, recklessly, and wantonly allowed the Device to be implanted in human beings without sufficient testing and with express knowledge of enhanced risks; and

    f. Were otherwise careless and/or negligent.

109. Despite the fact that Defendants knew or should have known that the Device caused harm to individuals that had the Device surgically implanted, Defendants continued to market, manufacture, distribute, and/or sell the Device.

110. Defendants knew or should have known that consumers, such as Plaintiff, would suffer foreseeable injury, and/or be at risk of suffering injury as a result of Defendants' failure to exercise ordinary care, as set forth above.

111. Defendants' negligence was the proximate cause of Plaintiff's physical, mental, and emotional injuries, as well as the economic loss which Plaintiff has suffered and/or will continue to suffer.

112. By reason of the foregoing, Plaintiff experienced and/or will experience severe harmful effects, including but not limited to, partial or complete loss of mobility, loss of range of motion, as well as other severe and person injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, the need for a revision surgery to replace the Device, as well as

reconstructive surgeries on both feet, with the attendant risks of complications and death from further surgeries.

113. Further, as a result of the foregoing acts and omissions, Plaintiff has suffered and/or will in the future suffer lost wages and a diminished capacity to earn wages.

**SIXTH CAUSE OF ACTION**
**NEGLIGENT MISREPRESENTATION**
**AGAINST ALL DEFENDANTS**

114. Plaintiff incorporates by reference, as if full set forth herein, each and every allegation set forth in the preceding paragraphs and further alleges as follows:

115. Defendant supplied false information to the public, Plaintiff, and Plaintiff's physicians regarding the quality, safety, and effectiveness of the Device. Defendants provided false information to induce the public, Plaintiff, and Plaintiff's physicians to purchase and implant a Device.

116. Defendants knew or should have known that the information they supplied regarding the purported quality, safety, and effectiveness of the implant would induce Plaintiff and Plaintiff's physicians to purchase and implant the Device was false and misleading.

117. Defendants were negligent in obtaining or communicating false information regarding the purported quality, safety, and effectiveness of the Device.

118. Plaintiff and Plaintiff's physicians relied on the false information supplied by Defendants to Plaintiff's detriment by causing the Device to be purchased and implanted in Plaintiff.

119. Plaintiff and Plaintiff's physicians were justified in their reliance on the false information supplied by Defendants regarding the purported quality, safety, and effectiveness of the Device.

120. As a direct and proximate result of Defendants' negligent misrepresentations, Plaintiff experienced and/or will experience significant damages, including but not limited to, permanent physical injury, economic loss, pain and suffering, the need for revision surgery to remove the Device, as well as reconstructive surgeries on both feet, with the attendant risk of complications and death from such further surgeries.

121. Further, as a result of the foregoing acts and omissions, Plaintiff has suffered and/or will in the future suffer lost wages and a diminished capacity to earn wages.

**SEVENTH CAUSE OF ACTION**
**BREACH OF IMPLIED WARRANT OF MERCHANTABILITY**
**AGAINST ALL DEFENDANTS**

122. Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further alleges as follows:

123. Defendants designed, manufactured, tested, marketed, and distributed the Device into the stream of commerce.

124. At the time Defendants designed, manufactured, tested, marketed, and distributed the Device into the stream of commerce, Defendants knew the use for which the Device was intended, and impliedly warranted the Device to be of merchantable quality.

125. Contrary to Defendants' implied warranties, the Device was not of merchantable quality or safe for the ordinary purposes for which it was to be used, because the Device was unreasonably dangerous and/or not reasonably fit for its intended, anticipated, or reasonably foreseeable use.

126. As a direct and proximate result of Defendants' breach of implied warranties regarding the safety and effectiveness of the Device, Plaintiff experienced and/or will experience significant damages, including but not limited to, physical injury, economic loss, pain and suffering, the need for further surgery to replace to faulty Device, as well as reconstructive surgeries on both feet, with the attendant risk of complications and death from such further surgeries.

127. As a result of the foregoing acts and omissions, Plaintiff has suffered and/or will suffer lost wages and a diminished capacity to earn wages.

**EIGHTH CAUSE OF ACTION**
**BREACH OF IMPLIED WARRANTY OF FITNESS FOR A**
**PARTICULAR PUROSE AGAINSTA LL DEFENDANTS**

128. Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further alleges as follows:

129. Defendants designed, manufactured, tested, marketed, and distributed the Device into the stream of commerce.

130. At the time Defendants designed, manufactured, tested, marketed, and distributed the Device into the stream of commerce, Defendants knew the use for which the Device was intended, and impliedly warranted the Device to be safe for such use.

131. Plaintiff reasonably relied upon the skill and judgment of Defendants as to whether the Device was safe for its intended use.

132. Contrary to Defendants' implied warranties, the Device was not safe for its intended use or fit for the particular purpose for which it was designed, manufactured, tested, distributed, and sold – for use and implantation as a total hip replacement system, because the Device was unreasonably dangerous and/or not reasonably fit for its intended, anticipated, or reasonably foreseeable use.

133. As a direct and proximate result of Defendants' breach of implied warranties regarding the safety and effectiveness of the Device, Plaintiff experienced and/or will experience significant damages, including but not limited to, physical injury, economic loss, pain and suffering, the need for further surgery to replace the faulty Device, as well as reconstructive surgeries on both feet, with the attendant risks of complication and death from such further surgeries.

134. As a result of the foregoing acts and omissions, Plaintiff has suffered and/or will suffer lost wages and a diminished capacity to earn wages.

## PUNITIVE DAMAGES

135. Defendants' conduct, as described above, was done with actual malice, that is, evil motive, intent to injure, ill will and/or fraud. Defendants risked the lives of consumers and user of their products, including Plaintiff, with knowledge of the safety and efficacy problems and suppressed this knowledge from the general public. Defendants made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting consuming public, all to the detriment of the purchasers of the product, generally, and Plaintiff, in particular.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for the following relief:

1.    Judgement in favor of Plaintiff and against all Defendants, for damages in such amounts as may be proven at trial;

2.    Compensation for both economic and non-economic losses, including but not limited to medical expenses, loss of earnings, disfigurement, pain and suffering, mental anguish, and emotional distress, in such amounts as may be proven at trial;

3.    Punitive and/or exemplary damages in such amounts as may be proven at trial;

4.    Restitution and disgorgement of all revenue that Defendants have obtained through the manufacture, marketing, sale and administration of the Device;

5.    Attorneys' fees and costs;

6.    Pre- and post-judgment interest; and

7.    Any and all further relief, both legal and equitable, that the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a jury by trial of all claims asserted in this complaint.

Dated this ___9th___ day of February, 2016.

KILLIAN DAVIS
Richter & Mayle, PC

J. Keith Killian, Esq.       No. 9042
202 N. 7th Street
Grand Junction, CO 81501
Telephone: 970-242-0707
Fax: 970-242-8375
E-mail: keith@killianlaw.com